Good morning, counsel. This panel will be hearing just one case together this morning, and that is the inre Hertz Corporation, numbers 23-1169 and 23-1170. And we will start with you, Mr. Sample. Good morning. Good morning, Your Honor. May it please the Court, Mark Stansel for appellant Wells Fargo Bank as indentured trustee for the senior notes. Also present is Richard Padone, counsel for U.S. Bank as indentured trustee for the promissory notes, which has joined our arguments with regard to post-petition interests and will rely on the briefs in my argument. But Mr. Padone is available to answer any questions the Court may have specific to his client. And with the Court's permission, I'd like to reserve five minutes for rebuttal, if I may. Thank you. Thank you. Good morning. I represent holders of nearly $2 billion in senior notes that Hertz's bankruptcy plan deemed unimpaired under the bankruptcy code, but refused to pay hundreds of millions of dollars to which they were entitled under their indentures. And despite denying these senior creditors a full recovery, the plan sent more than a billion dollars in value to pre-petition equity. Are we primarily talking about the 26-28 notes, or are you still trying to bring into play the 24 notes? We'll rest on the briefs with respect to the 24 notes, Your Honor, but the 26 and the 28 have the make-hold. The 24s and the 22s do have post-petition interests, which is implicated by the 11-24-1 argument. So the 24 notes make-hold premium will rely on the briefs, but post-petition interest applies to all of them. First and foremost, this plan violated the bankruptcy code in two main ways, and first and foremost, it failed to comply with Section 11-24-1's requirements for deeming creditors unimpaired under both this Court's express reasoning in in-rate PPI industries and independently under the solvent debtor principle as recently reaffirmed by the Fifth and Ninth Circuits. And secondly, I'll get to why this make-hold, this in particular, is not unmatured interest or its economic equivalent. Counsel, could I ask you to start with something that I'm wrestling with on the characterization of the redemption premium? Because you're asking us to treat it more like liquidated damages, some sort of penalty and not as interest, but the theory seems to be that that's damages that are to compensate for a change in market conditions, i.e., a change in interest rates. So how is interest different from damages for a difference in interest? So if I could change the word from interest to oranges, I think it'll make a little more sense. So suppose I have a contract with my supplier to sell me 100 pounds of oranges every week for a year, and he says it's $1 per pound, so it's $100 a week. He breaches that contract some period of time in, and now the market price of oranges is $1.25 a pound. I have to go out, I've got to find another supplier, and that supplier is going to charge me $1.25 a pound. The damages I have is that extra $0.25 I'm paying because of the change in the market price of oranges, but we don't say that that's the equivalent of the oranges. We say that is the damages caused by having to go out and replace your product at a higher price. So in the interest rate context, if I have lent money to Hertz, say, at 6% interest, but then interest rates go down a lot, the market rate goes down, and now Hertz can borrow that money at 3% because the market is more favorable. Well, I've got to go out and reinvest that, and I've been damaged by the change in the market price of credit, and that is different from the interest itself, and that's what 502B2 is, in fact, addressing, is the interest itself may be disallowed, but you can't agree to damages for the reinvestment differential. So, for example, we all have mortgages. Didn't Judge Walrath make a finding on that, talking about the appendix, page 74, where she said that the repayment premium is, quote, not at all tied, close quote, to the note holder's reinvestment cost? I don't think that's a factual finding, Your Honor. I think it is agreed how it works. If she's referring to not tied to the reinvestment cost, I think she's referring to her belief that calculating it based on the interest remaining is not tied to reinvestment cost, but, in fact, that is the virtue of this witness. Is this a matter of law or a matter of fact? A matter of law, Your Honor. There's no dispute of fact in this case. We ended up doing discovery as to how the make whole functioned, and we ended up in violent agreement as to how it worked and how the math worked. We just disagree about whether that is, as a legal matter, the economic equivalence. But when you do that math, how much of the pie is unmatured interest, and how much is the orange's kind of damages that you described? None of it is unmatured interest under our understanding of the term because it discounts the future interest according to the treasury rate that's then prevailing. So if treasury rates – so take the inverse example. Suppose that treasuries – or when we say treasury rates, that's the proxy for the market generally. If the interest rate environment becomes more favorable, rates go up. I actually have no damages because when you discount the future coupons at a higher rate, the present value goes down. And so that is why actually the bonds have a floor. The redemption premium is the greater of 101 or this make whole calculation that you do because that can actually be a negative value. You can do somebody a favor by redeeming their bonds. And that's why it's not the economic equivalent of unmatured interest when they're giving you something or they're taking an action, a redemption, that may in fact be favorable to you. You may have no damages. And it's at that 1% floor because there's always some sort of friction cost in going out and having to find a new credit even in a better environment. Well, doesn't that take us back to a fact question of whether there are actually damages here and how we should interpret that statement by the district court? I don't think so, Your Honor, but I mean I asked Mr. Clement to identify a different factual opinion on how this worked, but I think in questions of historical fact, what happens and how it works, I think it's purely a question of law as to what the cases mean when they say economic equivalent of unmatured interest. But if I may, may I jump back to solvent better because you don't need to reach any of that with respect to characterizing the make whole. With respect to the Fifth Circuit's opinion in Ultra, which we agree with most of the conclusions of, I think actually the proper analysis is the other way around where you start with whether we are entitled to everything that we're owed because we were deemed unimpaired under 1124-1. Can you backtrack with me just a bit here on the analogy you're trying to give? The prepayment premium is what? The prepayment premium here is what? What are the components? It is you are required to pay the principal, accrued but unpaid interest, and then a calculation that is the present value of, and I'll come back to put a pin in present value, present value of the coupon payments to the first call price plus the full first call price. Which is half your semiannual payment. Well, not exactly, Your Honor, because it's 103, not three. So they mischaracterize below. They say, well, it's just one semiannual payment. But when you present value 103, you're actually present valuing the principal as well. So you end up, I had to have this explained to me by people who can do math, which is not a litigator, but present valuing 103 minus 100 is not the same number as present valuing three because you're present valuing the principal. But so does the fact that there could be this 103 claim matter to your analysis? Well, we don't think so, because we think that as long as they are present value according to the market rate, the then prevailing treasury rate, you are getting a more precise measure of reinvestment damages. But what ties them then to the attempts to reinvest that Judge Walras said to her did not exist, and you're saying that's not a finding of fact? Because the contract has duration. A bond contract has a certain amount that's left on the duration. So that's what your expectation was for how long you were going to be able to benefit from the market rate that you bargained for. And that's sort of the irony of Hertz's position, which is it says it may not be or is not an unmatured interest if it's just some arbitrary number. But if it happens to be calculated in correspondence to what your actual damages are, so if I have two years left on my bond, and I want to find out how much of that delta I'm going to lose by that change in market price will affect me, it is directly related to how many coupons are left on that contract. So it is a more precise measure of reinvestment damages. Their position turns that on its head and says, well, if you just picked 105 or 110 or some arbitrary number that doesn't happen to use interest as an input, that's not going to be unmatured interest. So I don't think that makes, frankly... Anything in the loan agreements that says that the 1%, for example, is deemed to be by the parties the amount that will be up covering reinvestment inquiries if you have a prepayment? Nothing explicit except setting that as the minimum, Your Honor. But that recognizes, I think, that the point that we're making, which is the other delta, the other way to calculate the make-all if that minimum is not triggered, may in fact go negative, right? So it is actually showing you that redeeming a bond, if for whatever reason Hertz redeems a bond in interest rate conditions like today, for example, had they redeemed it today, we could reinvest our principal at a higher rate. They'd be doing me a favor other than the 1% I've got to go out, the parties agree I've got to go out and do some shoe leather to find the next bond. If I could switch gears for just a second. What's your best argument for the proposition that, as a matter of law, unimpaired creditors may not receive lesser recoveries than they would had they had the rights of an impaired creditor? I think both the Fifth and Ninth Circuits and... I get it. We've read them. All right. But what's the argument? The argument is it would turn the bankruptcy code on its head to deem it... May I continue, Your Honor? So we're going to add 15 minutes. We're going to go 30 minutes each side. So we should be done in 15 minutes. Thank you. Thank you, Your Honor. It would turn the bankruptcy code on its head to say that an unimpaired creditor gets less than an impaired creditor because an impaired creditor under Hertz's position would still be entitled to the federal judgment rate of interest that they're saying, but would also get the right to vote on the plan. And so we are deprived, as unimpaired creditors, we're deemed to accept. And so we get nothing under the code's protections. We don't get the protection of an impaired accepting class and a cram-down vote. And here I think it's beyond serious dispute that the plan would not have been confirmable had we been treated as impaired. So we were denied the core protection under the cram-down rules of somebody whose ox is getting gored, and the case says that's okay, that's the impaired accepting class requirement under 1129B. It's not that different, Your Honor, from I think the case was Jevic, where the Supreme Court talked about structured dismissals and said, look, even if structured dismissals aren't specifically addressed in the code, we wouldn't expect those to allow sort of a deviation from the core priority scheme that's in. But you've got the flip here. You've got a precode practice that two courts are saying, okay, there's a presumption that it continues on absent an explicit item in the code that disproves it. Now, you could flip that around and say, where should the presumption be? On whom should the burden reside? Well, we have that because the presumption is in favor of impairment, right? So it is their burden to overcome the presumption that we are impaired. But I'll do you one better, Your Honor. I don't usually go to legislative history this early in the morning, but if you look in the repeal of 1124.3. 50 years ago, maybe. Not today. Recently we're all textualists now. I'm thinking back to Volpe v. Massachusetts Turnpike Authority. The Supreme Court wrote an opinion that says we can't figure out the legislative history, so I guess we have to go to the statute. Life has changed, has it not? I think I'd be struck by lightning if I said that, but going to the repeal of 1124.3 in 1994, I want to – because Your Honor mentioned precode practice, I'd like to point you to what – to the extent we are going to look to that, which I think even Hertz is willing to – will give that some credence because they acknowledge that we do get some interest. They'd have no way to tie that textually, which I'll come back to in a second. But in the report, the House report that says we're going to reverse this unfair result from In Re New Valley, it cites two cases in the footnote that describes that a – it says that courts have held that we're in a state of solvent in order for a plan to be fair and equitable, unsecured and undersecured creditors. Claims must be paid in full, including post-petition interest, before equity holders may participate in any recovery. And what they cite are two Bankruptcy Act cases. Consolidated Rock, which is a secured creditor case, and In Re Deventure Holders, I think that's how we would say it, the First Circuit case, which is a 1982 Bankruptcy Act case. And it is undisputed that under the Bankruptcy Act precode, we got contract interest if the creditor is – if the debtor is solvent. So I think it's hard to avoid the implication or the understanding that Congress knew that it was continuing the precode practice when it was, 16 years later, repealing 11-2043. But should we think about it in those terms and whether we're going to carry forward precode practice and legislative history, or should we think about this as an application of the absolute priority rule along the lines that the Sixth Circuit did in Ray Dalcorny? We'll take either, but I think both are firm. I think the – I would start with actually 11-24-1 to say the text of the code says you get all of your legal, equitable, and contractual rights. So I think we have very much a firm textual footing. And courts have recognized, is there an equitable right to post-petition interest at the contract rate where the debtor is solvent? And PPI basically says if the code impairs you, that's not an impairment under 11-24. Well, most of the way there, Your Honor, but not quite. It says that with respect to 502b-6, but in two respects it says that rule does not apply to 502b-2. And if Your Honor will indulge me, because Hertz doesn't have a response to that actual reasoning from PPI except to say it thinks it's wrong, which we're all bound by what's in PPI. There are parts I don't like as well, but here's what this court said in PPI. And this is in page 324, F-3rd, 207. The court did not equate simple disallowance under any of 502b's subsection with code impairment. What the court said was that failure to pay contract interest would be impairment. And here's the passage. It says, it's quoting the Bankruptcy Court Opinion, and it says, refusing to pay post-petition interest as contractually required, quote, could not qualify for non-impairment under 11-24-1 because the failure to pay post-petition interest does not leave unaltered the contractual or legal rights of the claim. And two sentences later, the court says, we agree with the Bankruptcy Court's analysis. And there are two reasons in the court's opinions for why interest is treated differently. Our circuit in PPI and the Fifth Circuit and the Ninth Circuit, basically all three said to date that the impairment under the code is not impairment under 11-24. Correct, Your Honor, but this court in PPI defined what impairment under the code means. And then these other two reasons that it gave, it's having said that taking away interest would be impairment under 11-24, there are two reasons in the opinion. It says, first, it describes the legislative history of 11-24-3, and it's arguing the creditor there made the argument that, well, the repeal of 11-24-3 eliminates any possibility of any of the 502B subsections impairing or allowing impairment without shipping 11-24, and the court rejected that. But by distinguishing between interest and lease termination damages, it said the legislative history does not reflect a sweeping intent by Congress to give impaired status to creditors more freely outside the post-petition interest context. And then that is consistent with what the court said on page 204, where it defined code impairment under 502B-6 in contrast to 502B-2. What it said was, quote, unlike some other code sections, the limitation on damages under 502B-6 is absolute and is a limit based on fairness rather than a rule of convenience. And there's an internal quotation there from the Collier Treatise. We don't have to guess what the other code sections are because the Collier Treatise tells you it's 502. This is what it said, 502B-2. This is the Collier Treatise that the court is quoting from. It says, unlike Section 502B-2, the limitation on damages under 502B-6 has been found to be absolute. And this is critical. This next line tells you that the court in PPI is thinking about solvent debtors and the right to post-petition interest. Thus, even were the estate of a debtor found to be a solvent estate, an entity holding a claim disallowed under Section 502B-6 would not be allowed to share in distributions for amounts of the claims that are disallowed. So the court defines code impairment in NRA PPI as saying that is the rule for 502B-6, but it does not apply to the non-absolute prohibition in 502B-2. And we are bound by that. Nonetheless, the fifth and the ninth circuit. Did you disagree, Your Honor? No question. I disagree. And the second. I'll throw that in for good measure. But none of them, not one, have ever confronted the actual language, nor did the bankruptcy court below confront the actual language from this court's reasoning. I'm just speaking out loud here. Might not a stronger argument for your position be that it isn't the code so much as the plan designated your clients as unimpaired and the big picture here is that where's the money go? Because you've got a rare case where you have a solvent debtor, and does the money go to equity or does the money go to the note holders? Yes, Your Honor. But I don't see that argument being made. In fact, Your Honor, it's squarely in the solvent debtor principles expressed by the fifth and the ninth circuit's opinions on which we rely. And this does, so even if I'm dead wrong about what TPI says, the solvent debtor principle upholds an equitable right to be paid what you are owed where the debtor is solvent. Now, as the ninth circuit acknowledges, there may be equitable limits on that where, you know, solvency is close and paying one credit or all that it's owed may have some other consequence for the other claimant holders or the reorganized debtor. No one is suggesting that here. Hertz was massively, massively solvent. But that is exactly the bankruptcy principle that is at play here. The absolute priority rule, which, again, you know, this, I think, when Congress explained why they were repealing 1124.3 made that point that we were reading earlier, which is junior creditors do not recover, or junior claim holders in this instance, do not recover ahead of senior creditors. And this somehow takes nearly now more than $300 million and sends it to pre-petition equity. And there's absolutely no basis for it. And what's strange is Hertz says this is a textual approach. There is no textual basis whatsoever for that proposition. There's nothing in the code that says they can do it. And since they acknowledge that, given repeal of 1124.3, we are entitled to interest, they say, well, you should bring in this test from 1129.87 and 726.85, the best interest test. Is there another way to think about the impairment in that, with the designation of being unimpaired, that that deprives your clients of a legal right that they would otherwise have to preclude confirmation of the plan? You can't have your cake and eat it, too. Yes, Your Honor. So you can't be crammed down because there's no other class that rejects? Correct, Your Honor. And we think that is inherent in the text and structure of 1124.1 itself, which says you get what you're entitled to get, everything you're entitled to get, and that's why we take away your right to vote. And so that legal right to vote, if you think about it in the context, it's undisputed here that our bonds were redeemed. And the only way under our contract to cancel all of our rights is to redeem them by paying these full amounts that are owed. Only by redeeming the bond in full satisfaction could we be deprived of the right we would otherwise have as a creditor to have our voice heard and descend from the plan. And this is, I mean, we talk about it, I think, in the abstract a lot in bankruptcy cases and cram downs, where we talk about this impaired accepting class, but this is a prime example of why that requirement does some work. Because if you don't have an impaired accepting class, what you have is the potential for everybody else is more than happy they're getting paid in full and they're going to stick some money in their pocket and walk out. They don't really care what happens to somebody else. There's no check on whether there's excess value that's being misdirected. An impaired accepting class may not be the hardest requirement always to satisfy, but it does ensure at least that somebody gets hurt but realizes this is what the bankruptcy code requires, this is better for the debtor to do a cram down and move on, even if I'm not getting everything I want. It's like, you know, when I am arguing with my kids and I say, I'm not happy about this either. But right. You know, this is why we're going to do it. It's the same basic principle of fairness. And that is inherent in the code. And that's what I follow, how the distribution might violate what we generally think of as the sort of common law. Absolute priority rule. But why doesn't it comport with the codified absolute priority rule in 1129B2? Well, first of all, we don't get the that would apply only if we got the right to vote. So this is not a cram down. It's not a cram down plan because they couldn't they couldn't cram us down because they didn't have an impaired accepting class. But could they have? I think the answer is probably not with the solvent debtor. And as I think the Ninth Circuit recognized that there is an argument that I don't think has been resolved, that even in a cram down, a solvent debtor, if you're an impaired crammed down creditor, you would still have the right. And again, this makes sense. You wouldn't read you wouldn't think the code. There are some textual issues as well. I think it says that fair and equitable includes this treatment, but it doesn't necessarily say that's always sufficient. So I think there's some lack of clarity. But again, if you go back to the repeal of 1124.3 and what Congress said, it actually describes that fair and equitable term in the in the sense that it's used with this outside of the cram down context and says that the words fair and equitable are terms of art that have a well-established meaning under the case law of the Bankruptcy Act, as well as the Bankruptcy Code. Specifically, courts have held that we're in a state of solvent in order for a plan to be fair and equitable. Unsecured and undersecured creditors claims must be paid in full, including post-petition interest before equity holders may participate in any recovery. And I think that's the I mean, that is the core principle that was recognized under the solvent debt debtor principle, literally since the time of Blackstone all the way forward through the Bankruptcy Act. And it's now, I think, undisputed or not disputed here that the Bankruptcy Act has the same basic regime as the Bankruptcy Code. Section 63 of the Bankruptcy Act says no. When the case is filed, you see securing interest. But nonetheless, it is it is undisputed that unsecured creditors of solvent debtors routinely got it. This was the solvent debtor exception was traced back all the way to England and Blackstone. And everyone knows that in the 1970s. Why did it not at least creep into the bankruptcy code? I think it's not just crept in. I think it is loud, loudly in there in 1124. One, the text says you receive everything, all of your legal, equitable and contractual rights. And Congress experimented with a different rule. That's a general provision. And the argument against that is that you have a specific provision of 502 B2. Well, but that refers only to the allowance of a claim, an amount of an allowed claim. And there are numerous instances in which you get interest on an allowed claim under the code. And that's actually how the solvent debtor principle articulates it. So we're not arguing that when you get interest on an allowed claim, what, 726 and what else? Five or six be a secured creditor who's over. You're not an over. This is not an oversecured case. So. Correct, Your Honor. But how does it fit here? Because, well, there are 726 A5 says everybody gets the legal rate no matter what. If if the best interest test applies, it doesn't here. And 506 B says if you're oversecured, you get interest on your lab claim. But those are two instances. And I think it's important that 502 B2 and those other code provisions don't purport to be in conflict with each other. There's no not and there's nothing in 502 B2 that says, you know, notwithstanding 726 A5 or I guess it'd be the other way around. Nothing in nothing in 726 A5 or 506 B says notwithstanding 502 B2, you would get interest on your claim in these contexts. And the reason that those are important is that it shows that the bankruptcy court says, here's your allowed claim. And there are circumstances in which you get interest on your allowed claim, and that's what we're seeking here. We're not trying to say there's always an allowed claim for post petition interest, despite 502 B2. And that's how the solvent debtor principle has articulated it for literally for decades. So I think, Your Honor, I think it's perfectly consistent for the bankruptcy code to have carried forward as the Ninth Circuit and the Fifth Circuit held. We codified the Bankruptcy Act rule in Section 63 and said, allowed claims do not include post petition interest. But you get interest on your allowed claim under the solvent debtor principle to avoid sort of this bizarre result of, you know, leaving you unimpaired, a solvent debtor, and yet $300 million walks away. I'd like to take you back to something you said at the outset, that if we are looking at the solvent debtor exception, that we don't need to address the question of the characterization of redemption premiums. How is that? Why would we even reach the exception if we hadn't concluded as a result of our analysis and redemption premiums that we needed to consider the exception? There are each bond, there are four bonds. All four have post petition interest between the filing date and the effective date. We have argued for three of the four are also owed a redemption premium. So the 2022 bonds were redeemable at par, but they just got denied post petition interest. The 24, 26, and 28 bonds have redemption premiums that are required to be paid that recognize the reinvestment damages beyond the effective date. But I think the reason you don't need to reach it, there are two components here, but the reason you don't need to reach it is because the solvent debtor principle clearly states that you get what you are owed under your contract. And so the only dispute remaining is there's no dispute on the 26s or 28s anymore that we are entitled under the contracts to the post petition interest and the MAKL. And there's no dispute on the 22s and 24s that we're entitled under the contracts to the post petition interest. So were I writing Judge Elrod's opinion for the Fifth Circuit, I would have reversed the order and said the solvent debtor principle obviates the need to determine whether MAKLs are unmatured interests. And I think for this court, if it does reach that question, you'll need to confront the Third Circuit decision in the tax context, the settled long line of usury cases that say prepayment premiums are not interests, they are prepayment premiums or prepayment provisions. And that is sort of what the plain meaning of interest is in 502B2. Well, it depends if the definition is interest is the cost for using another's money. Yes, Your Honor, and that is what we don't have a definition of interest in the code, and so we would take the normally accepted definition. And that is why those tax cases and the usury cases are directly relevant. That's what it is. I realize the Fifth Circuit didn't agree with Judge Isger, but I think Judge Isger got it exactly right. That is what interest is. And for the reasons that we were describing, when a MAKL converts, calculates these reinvestment damages in this way, to actually measure reinvestment damages, you know, not just sort of a, you know, simple end run, I think that's a sort of wheelhouse case for application of that principle. If the court has any more questions, thank you for the additional time. Thank you. Thank you. Good morning, Your Honors, and may it please the court. Paul Clement for the appellees. Now, there's more than one question in this case, to be sure, but I think the critical question in this case is whether an unimpaired class in a solvent debtor case is entitled to more than the legal rate of interest that the code expressly provides in solvent debtor cases when it comes to liquidations and impaired classes. Appellants argue that they are entitled to more, and indeed are entitled to the precise amounts of unmatured interest that Section 502B2 expressly disallows based on a solvent debtor exception that they claim survives the enactment of the Bankruptcy Code of 1978. There are numerous problems with that argument, starting with the fact that it would have been a complete non-starter in 1978. In any solvent debtor case filed between 1978 and 1984, until the first amendments to the Bankruptcy Code, there would be no even arguable statutory gap, because impaired classes and unimpaired classes were treated the same for purposes of post-petition interest and the rest. And I presume it was taken out in 1984, I guess it was part of the Marathon Amendments, that you don't want the unimpaired doing a holdup. Right, which is exactly right, and it's worth asking the question, why is an unimpaired class resisting getting paid in full? The only reason they would resist that is because... They're getting paid less than what the impaired would get if they were a rejecting class. No, no, I would say they're getting exactly what the impaired class would get, because the impaired class, if you run it through to 726A5 through 1129A7, what they get is post-petition interest on their allowed claims at the legal rate. They do not, and this is the critical point, I think... And then the question is, what is the legal rate, although there's a good argument your way. Right, and I'm willing to engage in that, but I would say, what makes sense for the Code is to treat allowed claims, disallowed claims, I mean, you know, rather impaired classes, unimpaired classes the same, to treat reorganizations the same as liquidations. And the way you get that is first decide what are the allowed claims, and then you provide, if the debtor is solvent, post-petition interest at the legal rate to the allowed claims. But what you don't do is, at some point in the process, resurrect the precise claims under a contract that were disallowed by the operation of 502B. And I think that's equally true with respect to B2 or B6. So my friend's argument that somehow it's either the plan treating you unimpaired or something else that resurrects your contractual entitlement to pay, Mr. Salo could have made that argument in TPI. In fact, he did. And this Court said, no, you are not entitled to the out years of rent. The reason you're not is because B6 disallows that. So it is not the plan that's impairing you, it's the Code that's impairing you. But didn't it distinguish the treatment of post-petition interest from B6? Absolutely, and so would I. But what you get is not your contractual interest rate back. What you get is what the Code provides everybody in a solvent debtor case, which is post-petition interest at the legal rate. And that creates the parity of treatment between impaired and unimpaired liquidations and reorganizations. And the reason I think the Court sort of did what it did in PPI, one background fact to keep in mind, is that Mr. Salo on the amount of his allowed claim that survived the application of B6, he was getting post-petition interest. And nobody in that case was focused on what the rate was. In fact, if you go back and read the bankruptcy court, there's like a footnote that says, well, maybe it's at the state rate, maybe it's at the federal rate. Nobody really cared. Here we care because there's a difference between the federal rate and the contract rate. I'm not going to walk away from that. The whole reason we're here is because we are at a point where there's a pretty big delta. If this case arose today, given where the federal judgment rate is, I'm not sure we'd make it all the way to the Court of Appeals. We'd probably split the difference and go home. It's obviously a close case because when the drafting was done, there's an effect on page 43 of the plan that, okay, whichever way it goes, this plan will still work because there's, in effect, a reserve that's going to cover them for the 270 that they might otherwise claim. So it was good drafting. Right. So you don't have to have a redo. As I read the briefs, as I listened today, all I can think about is my days in doing this stuff. I'm in a room, and I'm representing the note holders, and someone on your side says, you know what we're going to do? We're going to cram you down. And I say, no, you can't cram me down because you don't have another class. They say, okay, here's what we're going to do. What we're going to do is we're going to call you unimpaired, and we're going to say that under 1124, you were unimpaired. You don't get a right to vote. Go sit on the sidelines and wait for this thing to end. And the question then from my side is, wait a minute, wait a minute. Are you going to take money that might go to me, and are you going to give it to the equity? Similar to what you had pre-1913 when you began to see the beginnings of the absolute priority rule when in railroad reorganizations, money was going to equity rather than accreditors. It's a tough issue, and there's good arguments on your side. The best one, obviously, is that, okay, solvent debtor exception. You've got to specifically say it's not done in the code. Yes, it is not done in the code because 502B2 has no real exception, does it? 502B2 does not have any exception. The code itself, and this is, I think, an important way to understand this and where I think you get to starting to see why we actually have quite a bit the better of the argument, which is it's wrong to say that the solvent debtor exception sort of didn't get incorporated into the code at all. The solvent debtor principles got codified in 726A5, but they didn't get the whole common law idea. What they got is we got a specific provision here that says you get post-petition interest on your allowed claims at the legal rate. That's if you're impaired. No, no. In a liquidation, it doesn't matter whether you're impaired or unimpaired. But this is not a liquidation. No, no, but I think it's an estate to address the issue here in the reorganization context without referencing the one provision in the code that most specifically addresses what happens when you have a solvent debtor, and that's 726A5, and what happens in that situation. But doesn't that apply to rejecting impaired creditors under A7, right? It does expressly, and I think it implicitly applies to unimpaired classes, and I'll explain why. Go ahead. But if I could, can I just start with just focusing on 726A5 for one moment more? Sure. Which is just to say it's important that what 726A5 does in the liquidation context is it doesn't get to that fifth step and say, okay, we are now going to revive some disallowed claims. It doesn't do that. It says, okay, as to the allowed claims that are paid under 1 through 4, we'll give you post-petition interest at the legal rate. Now, to get back to why I say that I think the code, you know, you could say there's a gap in the code, but I think the gap in the code is more apparent than real, and that's because if you go back to trying to understand what Congress tried to do in 1994, I mean, I think if you, and this is the way I understand the PPI opinion for what it's worth. If all you do is look at the question of plan impairment versus code impairment, if all you do is look at 502B, it takes you basically to the conclusion that Judge Okuda wrote, which is you get nothing. But what this court did in PPI, and I'm perfectly willing to do on behalf of my client, is to try to give some effect to the repeal of 1124.3 in 1994. And I think the way you give effect to that is you say, okay, the impaired class, what Congress clearly wanted to accomplish in 1994 was to not allow the unimpaired class to be treated worse than the impaired class for purposes of post-petition interest. That's what they were trying to do. The way you can do that under the code. It sounds like, from what you're saying, they didn't succeed. They did. They did exactly what the impaired class gets with respect to post-petition interest. They don't get exactly what the impaired class gets in terms of voting, but with all due respect, voting on a plan when the plan doesn't impair you, it's the code that impairs you, is incoherent. And that's what the first part of PPI says, and everybody's adopted that. If they had the right to vote, would there have been a plan here? I don't think there would have been, Your Honor. But maybe then there would have been a liquidation, and then maybe what they would have gotten is post-petition interest at the legal rate. But I don't think we should do the what if, because the way you sort of read all of this together is you basically say, the way that you have an unimpaired class comply with the repeal of 1124.3 is you... You're never going to have a liquidation of a company that's solvent, right? Wrong, with all due respect. Hertz is going to do a Chapter 7? I'm not saying Hertz under this case, but you said never. I'm talking about this case. Is Hertz in this case ever going to do a Chapter 7? Probably not, Your Honor, but if I could. I mean, the reason I was being expressive about resisting the idea is never is because you might think... I'm talking about this case. Okay, okay, but the code specifically thinks about and addresses a liquidation of a solvent debtor. And it addresses expressly the idea that what you get... You can't go back to the common law absolute priority rule, because 726.85 tells you what you get in that situation is post-petition interest at the legal rate. But you're not getting post-petition interest at the legal rate from the text as applied to this unimpaired creditor, right? You're coming up with that as a matter of equity. But once we're in the land of equity and equitable rights, I mean, even if we go to the legal rate, it also... The language is not at, right? It's no less than. Why doesn't, at that point, the absolute priority rule and concepts of equity come into play for the very reasons that you acknowledge that there would need to be post-petition interest at least at the judgment rate? So, equivalent and then an answer. 726.85 does not say no less than. It says at the legal rate. So, the premise of the question that it says no less than, with all due respect, is wrong. It says at the legal rate. That's what you get in the liquidation context under the pure text of the statute. That is a modification of the common law absolute priority rule, and it is a way to reconcile the whole code, because the argument that you go back to whatever your contractual entitlements were, that would have worked just as well for Mr. Salo in PPI. He had a contract that entitled him to all these rent payments in the out years. A pure digression. Prior to 1948, when you had 1961 or whatever it was that set the federal rate, what was the legal rate before 1948? I don't know. Yes. I don't know, but at the legal rate, it was added to the code in 1978. So, I don't know that you have sort of the time work question. People keep arguing as to what the legal rate is. So, when I look at 1129A7A2, that language is not less than the amount that such holder would receive or retain if the debtor were liquidated. Isn't that what's imported into the judgment rate, the legal rate? It is in the case of an impaired class, Your Honor. I was talking about the liquidation context. And again, just bear with me a second. The reason I start with 726A5 is it is the one place where the code specifically addresses the treatment of a creditor to a solvent debtor. And it says you get payment at the legal rate. So, for impaired classes 1129, it says no less than. But that's not, I mean, I think, and there's a debate here between a couple of bankruptcy judges. I think Judge Walroth has the better of that argument and says, like, the minimum that makes you unimpaired and the minimum that you would actually get as an impaired class is the legal rate. The reason it says no less than is because in a lot of plans, you're going to want to incentivize the impaired class to vote for the plan. So, you're going to offer them in the plan more than they are entitled to as a statutory minimum. And in those circumstances, that's why I think in the context of impaired class, it uses the phrase no less than. Because it's not like, well, okay, you didn't vote for what the plan that we offered you and now we're going to give you less somehow. So, that's why I think the reference point is the minimum that you would get in liquidation. And, again, what I think is so critical, the reason I keep going back to 726.85, is because it contemplates a solvent debtor. And what it doesn't say is, all right, we're going to revive otherwise disallowed contractual entitlements of the creditor before equity gets anything. It instead says, no. What we're going to do is we are going to give post-petition interest at the legal rate to everybody for their allowed claims, and then everything else goes to equity. And so, I go back to PPI. Mr. Salo, the landlord creditor in PPI, he had a contractual entitlement to a lot more money. But if you think about how the code would treat him, it wouldn't say, okay, well, we don't want equity holders to get a penny until all the contractual entitlements are satisfied. So, at step five of the waterfall, we're going to revive Mr. Salo's claim, notwithstanding B6. It says, no, you don't get everything you got. Maybe this is a different result than under the Act. But here's something I think that's critical. If there was no analog to 726A5 under the Act, my friend and I may have a disagreement about how similar 502B2 is with Sections 63 and 65 of the Bankruptcy Act. I think I have a better of that argument. But I think the more important thing is there's nothing like 726A5 in the Bankruptcy Act. So, I think it's ahistorical, frankly, to import a solvent debtor exception from the Bankruptcy Act and impose it on the code. Another way of doing it, I think hypothetically, if you were a common law judge in the Bankruptcy Act era, but the Bankruptcy Act era had the equivalence of 726A5 and 1129A, I think even in those days when people were a little looser about doing equity, I don't think you would have said in those circumstances, yeah, you go back to the contractual rate no matter what it is. I think you'd look at it and you'd say, all right, the Bankruptcy Act, hypothetically, the code now, expressly provides for the legal rate in three situations. I have a fourth that the code doesn't expressly address. What am I going to do in that fourth case? You wouldn't go to the contract rate, you'd go to the legal rate. And you said at the beginning of one of your questions, Judge Cross, that, you know, I can't get there on the text. I actually think I can because what I think is it's almost like think of it as like a step zero or a first step. I think the way you give effect to the repeal of 1124.3 in 1994 is you basically say, look, the impaired class, the unimpaired class, in order to be truly unimpaired, have to get the same post-petition interest as the impaired class. So in order to make them unimpaired, I have to give them post-petition interest at the legal rate. Because I've done that at the front end, there's no longer any lacuna in the statute because they're unimpaired. They don't get post-petition interest at the legal rate twice. They get it on the front end before you apply the statute. The impaired class gets it on the back end because of the cross-reference to 726A5. And if all this gets forced to liquidation, which may not be the case here, but in other cases it could be the idea that you go to liquidation, then everybody gets it, impaired, unimpaired, under the plain text of 726A5. So I think it all works. It doesn't create any anomalies. It treats impaired classes the same way as unimpaired classes. It treats reorganizations the same way as liquidations. All of that has a lot of virtue because you get a lot of weird incentives. Well, it's anomalous under the absolute priority rule, isn't it? I don't think so, Your Honor. Your Honor, and I guess what I would say is, like, the absolute priority rule is no different from the solvent debtor exception in the sense that it's a principle, but you've got to see to what extent it survives the code. And the absolute priority rule in a liquidation is not, look, before the equity holders get a penny, you have to go back and satisfy all your contractual obligations, even the ones we've disallowed under the obligation of 502B. What is that? I'm sorry. The 502B disallowances, the way the code treats this when it expressly gets it, is not that the absolute priority rule or solvent debtor exception or anything else says, we're going to go back and revisit those disallowances. It says our modified version of the absolute priority is equity can't get anything until all the allowed claims have been paid and post-petition interest at the legal rate has been paid. But that's it. And importing a common law absolute priority rule is no better than importing a common law solvent debtor exception if it ignores what the code actually does, which is codifies very specific principles about both priorities and what you do with the solvent debtor. And what would you do to distinguish, like, Jevick and LaSalle, which were, in effect, cases where there was trying to interfere, if you will, with the absolute priority rule in a way that gave money to the equity? I don't think any of those cases said that some common law notion of absolute priority trumps text. And the text here that, again, I think is so relevant... The point, if I look at Jevick, it's quoting Professor Markell that says, the absolute priority rule is the cornerstone of the bankruptcy code. Absolutely. But what do you mean by the absolute priority rule? And after 2685, what you mean by the absolute priority rule is not that equity doesn't get a penny until every creditor gets everything they were entitled to under their contracts, including the stuff that was disallowed by 502B. Well, then you come back to Mr. Stancil's argument that, in effect, the policy rationale is that you can't justify giving an impaired class more than you would give an unimpaired class. What would your response be to that? Because I didn't see much in the briefing on that. I would say the reason we don't respond to it is because we're giving them what an impaired class would get in terms of post-petition interest. The only thing they don't get is the same post-petition interest at the legal rate plus a vote. But the reason they don't get a vote is because of PPI. Giving somebody a vote on a plan that doesn't impair them is just a non sequitur. I mean, the logic of PPI, which every court has adopted, which I think is perfectly coherent, is to basically say, look, if the plan isn't doing the impairing, if the code or some other statute is what's doing the impairing, then you don't become impaired such that you get a vote on a plan because your beef isn't with the plan. Isn't that backwards? I mean, they would have voted against the plan because of that delta. And the way it seems sort of circular, the way you're reasoning. I understand the textual argument, and I think it's an excellent argument in terms of treating folks equally in both settings, impaired and unimpaired. But what about what ends up being a judicial denunciation of their legal right, the right to vote? It's not a legal denunciation of the right to vote. That happened because of what Congress put in 502B. And it's no different for my friends on the other side here than it was for Mr. Salo in PPI. He had a contractual right to those out years of rent. He didn't get it because of the operation of D6. As a result, he also was treated as unimpaired. He didn't get to vote either. He didn't like the plan. He would have voted against it. In fact, for some reason, the bankruptcy court there actually let him vote, and he voted against it. But nobody cared because his beef wasn't with the plan, and he didn't get his contractual entitlement outside of bankruptcy, not because anybody wanted to be unequitable, but because D6 said as clear as day, you don't get that as an allowed claim. And it may be that the code as a whole is less absolute about unmatured interest because there are certain circumstances where other provisions give you an entitlement to some degree of unmatured interest, relevant here at the legal rate. But my point is the code may be less emphatic about unmatured interest, but B2 is every bit as emphatic as B6 is. B2 is every bit as emphatic about unmatured interest as B6 is about out years of rent payment. And yet one more way to think about this, but I think they all roads lead to our result, not surprisingly because I'm saying it. But another way of thinking about this is I think B2 is way too emphatic for there to be any role for any sort of common law solvent debtor exception. I might grant you that the combination of 1129 and 726A5 leaves a little bit of a lacuna that allows you to sort of think, well, maybe we're going to treat the unimpaired class differently, even though I don't quite see it in the text. But you wouldn't at that point import the full-blown sort of solvent debtor exception that goes back to the contract rate. But all you would do is you would look at it and say, there's enough ambiguity here that I can treat the unimpaired class the same as the impaired class for purposes of post-petition interest. And if you do that, you are 100% consistent with everything in PPI, and you are also giving effect to what Congress did in repealing 1124.3. The only piece of Judge Etuda's reasoning that I take issue with is she would go all the way to say you get nothing. And I think the problem with that, which PPI recognizes, is that gives zero effect, or maybe it turns Congress into a monkey's uncle, but it gives zero effect to the repeal of 1124.3. And on that, if I could say one thing about the legislative history. My friend undersold how far he was deviating from textualism because he not only went to the legislative history, he went to a footnote in the legislative history. But if you read the legislative history as a whole, including that footnote, they're not talking about saying, okay, in these solvent debtor cases, we want to go back and treat things that the code specifically disallows. We want to re-allow them or revive them. It's all focused, including the footnote you read, on fair and equitable. So it's all focused on eliminating the anomaly that the unimpaired class is getting less post-petition interest than the impaired class. And you eliminate that anomaly if you basically say everybody, impaired, unimpaired, liquidation, reorganization, they all get post-petition interest at the legal rate. Now, obviously that puts pressure on what is the legal rate, but I do think Cotellucci has all of the better of that argument, and I'm happy to go into that. But I think there are multiple reasons why the legal rate is the federal judgment rate. In your view, what is the value of legislative history today? You know, it doesn't have a lot of role. This might be the rare case where you sort of, in trying to figure out this anomaly, you would, and, you know, there's legislative history and then there's statutory evolution. And I guess what I would say is, you know, I think you're going to get a dirty look from the Supreme Court if you really focus on every word in a committee report, but I don't think you're going to get a dirty look from the Supreme Court if you say we've got to give some respect. What if it is a conference report, if you have a House bill that's separate from a Senate bill, and then groups meet, they come out with a conference report, doesn't that get some more traction than the legislative history written by a staffer for a boss on a committee? Justice Breyer would say so. I don't think the current court would. Judge Cashman would have said so, too. Yeah. No, I mean, but I don't think the current court draws that distinction, but I do think they do draw a distinction between legislative history and statutory evolution. And I think they would be willing to say we've got to give some effect to the fact that 1124.3 was in the code for until 1994, and now it's out. But the way you give effect to that, and actually the way you give effect to the House report, is you say, ah, what they were hacked off about is the idea that the unimpaired class wouldn't get post-petition interest at all, and the unimpaired class would be treated worse than the impaired class. But the way you just make them equal, and you give them both post-petition interest at the legal rate, and then the only remaining difference is the vote. But again, the vote's incoherent. But the anomaly here isn't so much about differences between impaired and unimpaired. It's the fact that equity is getting all this money when. But that's where if, you know, I would, you know, let's take the impaired class, or let's take a liquidation. The anomaly that equity is getting paid before everybody gets their contractual entitlement, that anomaly is not anomalous under the code. It is operation of law by 726A5. Like, unless I'm wrong about what the legal rate is, then there's just no question that equity gets paid even though somebody had a contractual entitlement. They lost because of 502B. That's the difference between the codified absolute priority rule and the common law absolute priority rule. Absolutely. And the difference between the codified solvent debtor exception and the common law solvent debtor exception is every time Congress thought about solvent debtor, they said post-petition interest at the legal rate. That's what they did. And there's no reason to treat the unimpaired classes differently for those purposes, especially when the reason we're here is largely because in 1994 Congress thought, If you have an impaired rejecting class, what does equity get then? Is it zero? Well, what equity gets then is, like, you know, you don't have a plan, so maybe you get forced into liquidation, and then equity gets exactly. We've talked about Hertz is not going to liquidation. I mean, at some point, like. But my point is, the question is, if you have an impaired rejecting class, what does equity get? Everybody goes back to the drawing board, I think. I mean. That's probably the right answer, I think. Yeah. But it's not that equity somehow doesn't get, like, I mean, just because they vote against the plan doesn't mean their contractual entitlements pop back up. And that's a fundamental problem. You know, it doesn't matter whether you call it a contractual entitlement or an equitable entitlement. The fundamental problem with their position is it just, you know, it's flatly contradictory to PPI. It's flatly contradictory to what 502B2 says, which is you don't get unmatured interest. It's not part of the allowable claim. And if you go back to the waterfall, you know, what the waterfall does is it, one through four, pays all the allowed claims. It doesn't say. Can you confirm a plan paying equity more than zero? Yes. Yes. Absolutely. And you would have to in the case where. If there were a rejecting class, if they're impaired and they're rejecting class, can you get that equity more than zero? Yes, you can. I mean, again, you've got two situations. You know, you've got a situation where the only impaired class is objecting, in which case I think you've got to go back to the drawing board. You probably have, because you don't have, you can't do a cram down. Right, but if you have two impaired classes, one objecting, one not, go to the cram down. I don't think there's anything. And, again, this requires accepting that in that situation the impaired class gets post-petition interest at the legal rate, not something more, not something amorphous and equitable. But I think just Waller fully has the better of that argument. When you get to that point, you've got to have, like, you've got to have a rate. You can't just have, like, an equitable mess. You know, and the statute, again, like, your limits, the limits on the power of the court doing equity has got to be constrained by the statutory text. At that point, what you would give them is post-petition interest at the legal rate. I see my time's up. I'm happy to, if there's still questions, I'm happy to. Before you sit down, your argument seems to turn on the interpretation of PPI and whether we have here by function of the code or the plan a class that is left unimpaired. Can you address that very different reading of the case you have than Mr. Stansel? I mean, I'd be happy to. I mean, you know, I'm a little befuddled by Mr. Stansel's reading of it because nobody else has quite read it that way. I think the key to reconciling the readings is there's two things going on in, like, PPI. There's almost, like, two parts of that opinion. The first part of that opinion, you know, I don't think there's anything good in there for Mr. Stansel, which basically says, look, you know, B2, and there was B6, sort of disallows your claim. Your beef is with the code. It's not with the plan. Plan impairment, not code impairment. All of that, I think, helps us. The part, you know, and really it's not even a part of this court's PPI decision any more than a quotation of the PPI bankruptcy opinion. If you go back and read that opinion, I think that opinion fully supports our position. But in all events, you know, the second part of the opinion that he wants to rely on is to give effect to 1124, the repeal of 1124-3. And what Mr. Salo is arguing there is not really any different from what Mr. Stansel is arguing there, which is he says, okay, Congress, by repealing 1124-3, really wanted to make sure that before equity got anything, because that was also a solvent debtor case, I, Mr. Salo, get back my entitlement to the disallowed rent payments. And what this court basically said is, no, you're over-reading the repeal of 1124-3 because that was just about post-petition interest. And then what my friend wants to take from that is, oh, so like post-petition interest is completely different and you can ignore 502-B2 and you can ignore the first half of the PPI opinion. And my reconciliation is, no, all you said in the second half of PPI is you've got to give some effect to the repeal of 1124-3, and the way you give that is to make sure that they at least get some post-petition interest. Again, you didn't have to focus in that case about the rate, you know, the bankruptcy courts in New York, federal, whatever. I think probably there wasn't much of a difference between the two at that point, or we were talking about interest on $100,000, which is the amount of the allowed claim there, so nobody really cared about it much. Okay, thank you very much. Thank you. Could you begin with discussing how your view of PPI differs from that of Mr. Clement? Yes, Your Honor, one of us is reading from the decision and one of us is not. And with respect, the first half of PPI defines code impairment by saying, unlike some other code sections, 502-B6 is absolute. My friend has no answer to the fact that this court is citing the treatise, Collier, and quoting from that treatise that says 502-B6, unlike 502-B2, is absolute. So I think respectfully, he said, well, there are other code exceptions to 502-B2. But other than those exceptions, it's absolute. Well, but that's not what the Collier treatise this court was quoting said. It said, in the case of a solvent debtor, therefore, lease rejection damages, you wouldn't recover those, whereas you would in 502-B2. So, and I have, I think, I think we're all bound by what the court's reasoning was, and it defined code impairment in that, with that specific text. But let me go one further, which is PPI does not, even under his reading, does not compel his result. Both the Fifth Circuit and the Ninth Circuit's opinions agree with him on PPI. Now, as I mentioned, they didn't confront the language that we were discussing. No one has ever talked about it. I put it on the screen in front of the Bankruptcy Court below, but the opinion does not address it. But no one's ever addressed that. But both of those courts recognize that even though, in their view, 502-B2 takes away your legal and contractual rights to interest, the equitable right remains. And with respect to, with respect to that, Mr. Clement, it sounds, it sounds good, but he is reading you a statute that Congress did not enact, and he is reading you a House report for that measure that Congress, or the House, Congress did not write. His view is a solvent debtor Chapter 11 case should be, the distribution should be the same as a Chapter 7 liquidation. Well, that's bizarre on its base, but it also, there is no textual way to say Congress must have meant, they forgot, but they must have meant to make 726A5 applicable to Chapter 11 reorganizations, or the best interest tests applicable to unimpaired claims. They actually had that option, and they decided not to do it. And, for example, when they repealed 1124.3, they could have said, which is the rule that he's urging here, they could have said, just made an addition to 1124.3 and said, you can be unimpaired if you issue a loud amount of your claim paid in cash plus interest at the legal rate under 726, as provided in 726A5. They didn't do it. They repealed it. And as we're talking about statutory evolution being a much stronger signal than legislative history, I think actually I tend to agree, but I think that cuts very much against Hertz in this context. And when we get to 1124.3's repeal in the House report, Hertz is trying to have it both ways. They acknowledge because they realize there's just no logical way to understand the repeal. They say, well, Congress must have meant to give you some interest. But what Congress was really talking about in the House report was treating impaired creditors and unimpaired creditors the same monetarily. There's no mention of that in the House report. I just reread it. I mean, admittedly, it's not very long. It doesn't ever, ever, ever once say that. You know what it says instead? It says the passage I've quoted a couple times, but then it actually specifically disavows any intent to import the best interest test back to unimpaired creditors. Here's what it says. With respect to Section 1124.1 and 2, so that's what remains of unimpairment after repeal, this amendment would not change the beneficial 1984 amendment to Section 1129.87 of the Bankruptcy Code, which excluded from application of the best interest of creditors test classes that are unimpaired under Section 1124. Respectfully, he's saying what he would have done. He's saying what they would have done if they had amended the code in 1984, maybe they would have left the legal rate applicable to unimpaired creditors. Or in 1994, instead of repealing 1124.3, they would have added legal rate onto it. That is not an exercise in statutory construction. And to the extent that we're talking about pure legislative history, I'm not aware of any principle that if Congress puts the cases in a footnote, they don't mean exactly the same thing. And I think he has no answer, Mr. Clement has no answer to the fact that the House report cites two pre-code Bankruptcy Act contract rate of interest cases in describing what unimpaired creditors get. Briefly, Your Honor. The amazing thing about New Valley is you have a Bankruptcy Court decision in Congress acts almost immediately, which almost never happens. We have discussed that. It's tough to get them to pay attention, I think. One brief note on the factual issue, Your Honor. This case was resolved in summary judgment, so Judge Walrat did not make a factual finding, could not make a factual finding as to reinvestment damages. She made a legal error as to her supposition that reinvestment damages are legally not, or pardon me, are legally the same thing as unmatured interest. If the Court has any further questions, we appreciate the time of the argument this morning. I would thank both counsel for an excellent briefing and argument. We will keep the case under advisement, and we'd ask that counsel prepare a transcript of argument and jobs for the class. Thank you. Thank you.